**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-3961
_____

UNITED STATES OF AMERICA,

Appellant

v.

ROBERT DEAN CAESAR
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(District Court No.:  2:18-cr-00525-001)
District Judge:  Honorable Gerald J. Pappert
_____

Argued February 11, 2021

(Filed June 23, 2021)

Before:  CHAGARES, SCIRICA, and RENDELL, *Circuit Judges.*

William M. McSwain
Seth M. Schlessinger
Jennifer A. Williams (**Argued**)
Robert A. Zauzmer
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106

Counsel for Appellant

Stephen P. Patrizio
Two Penn Center Plaza
1500 John F. Kennedy Boulevard
Suite 1205
Philadelphia, PA 19102

David E. Robbins (**Argued**)
8 Erika Lane
Broomall, PA 19008

        Counsel for Appellee

_____

O P I N I O N
_____

RENDELL, *Circuit Judge*.

        Facing federal child pornography charges, defendant-appellee Robert Caesar moved to suppress evidence seized pursuant to search warrants executed by the Pennsylvania State Police. The District Court granted the motion in part, suppressing thousands of images of child pornography and photographs of Caesar's sexual abuse victims. The Government now appeals.

        The initial warrant application contained information that Caesar had sexually abused two children in his home and, on multiple occasions, took to the Internet seeking out used children's undergarments and photos and videos of partially clothed children. Although the supporting affidavit included no express allegations that Caesar possessed child pornography, it stated that child abusers "routinely keep" such images. App. 49. The magistrate judge issued a warrant authorizing officers to search Caesar's home for child pornography and other sexually explicit images of minors, among other things, and several items of electronic equipment, later found to contain child pornography, were seized. Charged under federal law with producing, receiving, and possessing child pornography, Caesar moved to suppress the images. The District Court excluded the images, determining that the statements linking child molestation with child

2

pornography failed to establish probable cause. It further concluded that the affidavit was so deficient that the good faith exception to the exclusionary rule did not apply. Because we conclude that the officers relied on the initial warrant in good faith, we will reverse that part of the District Court order suppressing the images and remand for further proceedings.

## I. BACKGROUND

The evidence at issue was gathered by State Police officers pursuant to three search warrants while investigating Caesar for various sexual offenses involving minors. Because our Fourth Amendment inquiry turns on the sufficiency of the affidavits of probable cause presented to the issuing magistrate, the facts are largely drawn from those affidavits. *See United States v. Zimmerman*, 277 F.3d 426, 430 n.3 (3d Cir. 2002).

### A. The Initial Tip and Caesar's eBay Activity

In July 2017, the State Police received a tip from the National Center for Missing and Exploited Children ("NCMEC") about suspicious online activity by an eBay user. Officers investigated the tip and discovered several outgoing messages from the user's account, horses357, seeking to buy children's used underwear and swimsuits. In one message, the user asked for a photo of the inside of the clothing item and for information about the age and weight of the child who previously wore it. In another message, the user, posing as a parent buying swimwear for his son, asked, "who wore this and at what age?" App. 49. In a third message, the user posed as a child looking for photos or videos of other children in their undergarments:

> Hi, [i]t's JJ again. I won these, yeah! But I spent more than dad said I could. He might not be to [sic] happy. Can your son David do another video in these or the white ones before you send them? Or some pics please? I didn't win the black and blue ones my brother wanted. Someone out bid [sic] me . . . after the sale was over. Can you ask your son if he would like to exchange email addresses please? . . . Ok, thanks again. JJ.

3

App. 50.

The State Police learned that horses357 was registered to "Robert Caesar . . . of 906 Street Rd., Oxford, PA." App. 49. Several other pieces of information corroborated Caesar's connection to the eBay account. The account listed Caesar's work email address and phone number, and the Internet Protocol ("IP") address associated with the account was tied to a home address in Oxford. Driver's license records also showed that Caesar's home address was 906 Street Road. State Police Trooper Stefano Gallina interviewed the owner of the residence, who stated that Caesar had rented the house for four years. The landlord also told Gallina that Caesar had never been married and had no children.

### B.    Subsequent Investigation into Sexual Abuse of the Two Brothers

While the initial investigation was ongoing, in January 2018 Gallina received a referral from Children and Youth Services alleging that Caesar had sexually abused two adolescent brothers. On January 17, 2018, Gallina interviewed the brothers—ages sixteen and fourteen—and their mother, separately. The older brother told Gallina that, a few years prior, Caesar began paying the boys to do occasional chores around his house. "[S]ome time" later, Caesar started supplying him (then fourteen years old) and his brother (then twelve years old) with alcohol. App. 50. Around June 2015, Caesar began sexually abusing the boys. Caesar would provide the older brother alcohol and then take him to Caesar's bedroom, where Caesar performed oral sex on him and forced the boy to masturbate him. The sexual abuse took place "several times" and "always" occurred in Caesar's bed. App. 50. On multiple occasions, Caesar asked the older brother to engage in other sexual acts with him, but the boy refused. The boy agreed, however, to let Caesar keep a few articles of his underwear.

The younger brother advanced similar allegations in his interview with Gallina. He also stated that Caesar supplied him with alcohol and brought him to the bedroom, where Caesar sexually abused him. Both boys claimed that the sexual

4

conduct continued until late December 2017, at which point their parents prohibited them from returning to Caesar's house. In her interview with Gallina, the boys' mother stated only that the younger brother returned home from Caesar's house one evening in late December 2017 smelling like alcohol. She did not share any information about the alleged sexual abuse.

The day after these interviews, Gallina applied for two warrants to search for evidence of aggravated indecent assault of a minor, in violation of 18 Pa. Cons. Stat. § 3125(a)(8). The warrant applications sought authority for the following:

- In the first warrant, a search of Caesar's home for two categories of evidence: (1) physical evidence of the alleged sexual abuse, consisting of "[s]emen and bodily fluid belonging to the victims, children's underwear and swimwear," and (2) "images of child pornography, child erotica or nudity and/or any images of the victims in any form (hard copy photographs, VHS tapes, DVD's, CD's, or stored on personal electronic devices)." App. 47. This second category of evidence is at issue on appeal.
- In the second warrant, a collection of a sample of Caesar's DNA.

The affidavits of probable cause supporting the first and second warrants each consisted of four single-spaced pages that set forth a detailed description of Caesar's eBay messages and the sexual abuse allegations against him.

In addition, the affidavits provided an extensive accounting of Gallina's experience and training as a State Police trooper and ex-Federal Air Marshal. At the time of the investigation, Gallina had been a trooper for approximately six years and "ha[d] investigated several thousand criminal incidents." App. 48. Many of these criminal investigations "included the search and investigation of electronic communication devices, electronic records and data." App. 48. He had also taken courses on general investigation techniques, investigation methods for drug crimes and violent crimes, and criminal behavior assessment, among other subjects. None of Gallina's training addressed sex crimes specifically.

5

Based on his training and experience, Gallina made several statements about the tendency of child abusers to possess child pornography and other sexually explicit images. He alleged that he

> kn[ew] that those involved in the sexual abuse of children and juveniles routinely keep and maintain . . . [digital or physical copies of] photographs of nude children and of children posed in various states of undress . . . [and] videos of nude children and of children posed in various states of undress performing sexual acts . . . .

App. 49. At other points in the affidavit, Gallina repeated similar allegations that child abusers "routinely and commonly store, share, and maintain" sexually explicit images and videos of children. App. 51. He also averred that individuals who sexually abuse children often browse the internet for child pornography and used articles of children's clothing on websites such as Craigslist, eBay, and Facebook Marketplace.

A Chester County magistrate judge issued the two warrants and the State Police searched Caesar's home the same day. During the search, officers seized stained bedsheets, pillowcases, and articles of stained children's underwear. They also discovered several pieces of electronic equipment, including a cell phone, digital camera, various VHS cassettes and compact discs, two computers, and multiple external hard drives. One of the hard drives was found wedged between the mattress and box spring in Caesar's bedroom. The officers did not search the devices immediately upon seizing them.

Later that day, following the search, Gallina arrested Caesar and brought him to the police station for questioning. After Gallina read Caesar his *Miranda*[1] rights, Caesar agreed to be interviewed. The interview proceeded for about an hour until Caesar told Gallina that he did not want to answer more questions. Notwithstanding Caesar's multiple invocations of his right to remain silent, Gallina continued to question him. Caesar went on to admit that he sexually abused the two

---

[1] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

brothers, used the underwear and swimsuits that he bought on eBay as a means for sexual gratification, and viewed child pornography on some of the seized devices. Before the District Court, the Government conceded that all these post-invocation admissions should be suppressed. The parties do not contest this issue on appeal.

Although the initial warrant permitted a search for images "in any form . . . [including those] stored on personal electronic devices," App. 47, Gallina later secured an additional warrant specifically authorizing a search of the seized devices' contents. At oral argument, counsel for the Government noted that law enforcement officers often seek an additional standalone warrant to search computer devices as a "belt-and-suspenders" approach to conducting investigations. Oral Arg. at 12:20–13:45. The third warrant application included nearly all the information in the first affidavit, in addition to a summary of the items seized in the search of Caesar's residence and Caesar's post-invocation admissions from his interrogation. Equipped with both the initial warrant and third warrant, the State Police found over 70,000 images and videos of child pornography on the seized devices. These images included several sexually explicit photos of the younger brother.

### C. Caesar's Criminal Proceedings and Suppression Motion

Caesar was indicted in federal court and charged with production of child pornography under 18 U.S.C. § 2251(a) and (e), receipt of child pornography under 18 U.S.C. § 2252(a)(2), and possession of child pornography under 18 U.S.C. § 2252(a)(4)(B).[2] He then moved to suppress all the

---

[2] In addition, the Chester County district attorney charged Caesar with various state child sexual assault and child pornography offenses. While the district attorney's office dropped the state child pornography charges in favor of the federal prosecution, it pursued the sexual assault charges involving the two brothers, and a jury convicted Caesar in August 2020. In that case, the Chester County Court of Common Pleas suppressed Caesar's post-invocation

evidence seized in the search of his home. The District Court denied the motion as to the DNA sample and physical evidence of sexual abuse but granted it with respect to the "images of child pornography, child erotica or nudity and any images of the victims"[3] discovered on the electronic devices. *United States v. Caesar*, No. 18-525, 2019 U.S. Dist. LEXIS 206763, at *26 (E.D. Pa. Nov. 26, 2019). This timely appeal followed. If affirmed, the District Court's suppression order would effectively terminate Caesar's federal prosecution, which involves only the child pornography charges.

## II.    JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction under 18 U.S.C. § 3231. We exercise jurisdiction over this interlocutory appeal under 18 U.S.C. § 3731. In reviewing the District Court's suppression order, we review its factual findings for clear error and exercise de novo review over its legal conclusions. *See United States v. Werdene*, 883 F.3d 204, 209 (3d Cir. 2018).

## III.    DISCUSSION

The Fourth Amendment forbids "unreasonable searches and seizures" and mandates that "no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. The violation of an individual's Fourth Amendment rights, however, does not always guarantee suppression of evidence derived from an illegal search. *See United States v. Katzin*, 769 F.3d 163, 170 (3d Cir. 2014) (en banc). That is because "the exclusionary rule is not an individual right," but a prudential remedy meant to deter law enforcement officials from engaging in unreasonable searches and seizures. *Herring v. United States*, 555 U.S. 135, 141 (2009); *see also Stone v. Powell*, 428 U.S. 465, 482 (1976) (describing the exclusionary rule as "a

statements, but not any physical evidence obtained in the searches.

[3] Although courts have distinguished child pornography and "child erotica," for convenience we will refer to the "images of child pornography, child erotica or nudity" identified in the first and third warrants collectively as "child pornography." *See, e.g.*, *United States v. Vosburgh*, 602 F.3d 512, 520 n.7 (3d Cir. 2010).

judicially created means of effectuating the rights secured by the Fourth Amendment"); *Elkins v. United States*, 364 U.S. 206, 217 (1960) ("The [exclusionary] rule is calculated to prevent, not to repair.").

Because the suppression remedy is an "extreme sanction" that carries significant costs, *United States v. Leon*, 468 U.S. 897, 926 (1984), however, it "has always been our last resort, not our first impulse," *Hudson v. Michigan*, 547 U.S. 586, 591 (2006). Given these costs, the Supreme Court in *Leon* established the "good faith" exception to the exclusionary rule, which prohibits suppression of "evidence obtained in objectively reasonable reliance" on a warrant later invalidated for lack of probable cause. 468 U.S. at 922.

## A. The District Court Opinion

The District Court concluded that the officers lacked probable cause to search for the images and that the good faith exception did not apply. In so holding, the District Court primarily relied on our opinion in *United States v. Zimmerman*, a Fourth Amendment case that, as here, involved a warrant application that alleged the supposed tendency of child molesters to possess child pornography. The District Court determined that, under *Zimmerman*, Gallina's statements about the molestation-pornography link were merely "boilerplate" and that, without more factual support, these statements failed to establish probable cause to search for evidence of child pornography. *Caesar*, 2019 U.S. Dist. LEXIS 206763, at *18, 20. Despite the detailed averments about Caesar's eBay messages and prolonged sexual abuse of the brothers, the District Court held that the first affidavit "lacked any facts tying Caesar's home to child pornography or to images of the victims." *Id.* at *18. Absent such facts, the court reasoned, the affidavit failed to state probable cause to search for the images. Citing *Zimmerman* and our opinion in *Virgin Islands v. John*, 654 F.3d 412 (3d Cir. 2011), the District Court further held that the weaknesses of the first affidavit were so glaring that it was "entirely unreasonable" and, "at a minimum, grossly negligent" for Gallina to rely on the constitutionally infirm warrant. *Id.* at *20. Thus, the good faith exception to the exclusionary rule did not apply.

9

The District Court concluded that the third warrant also did not render the images admissible. Although the third warrant provided additional authorization to search the electronic devices—separate from the initial warrant—the District Court held that the images were nonetheless tainted by the unlawful search of Caesar's house because Gallina leveraged the fruits of that search to elicit Caesar's confession during the interrogation.[4] Pointing to what it considered to be Gallina's "grossly negligent" reliance on the first warrant and his willful violation of Caesar's right to remain silent during the later interrogation, the District Court also held that Gallina did not rely on the third warrant in good faith. *Id.* at \*22 n.6, 23 n.8. The court therefore concluded that the images should be suppressed.

On appeal, the Government urges that the District Court erred in two ways. First, it argues that the searches of Caesar's home and electronic devices were supported by probable cause and therefore did not violate the Fourth Amendment's prohibition against unreasonable searches and seizures. Second, it argues that in any event, the State Police reasonably relied on the magistrate judge's probable cause determinations such that the good faith exception should

---

[4] The District Court declined to decide whether Gallina's violation of Caesar's right to remain silent alone required suppression of the images. As the District Court noted, the "fruit of the poisonous tree" doctrine does not apply to nontestimonial, physical evidence derived from a suspect's voluntary statements made before officers inform him of his *Miranda* rights. *See United States v. Patane*, 542 U.S. 630, 636 (2004) ("The Self-Incrimination Clause . . . is not implicated by the admission into evidence of the physical fruit of a voluntary statement."); *United States v. DeSumma*, 272 F.3d 176, 180–81 (3d Cir. 2001). But we have not opined whether that same principle applies to physical evidence derived from a suspect's statements elicited in violation of *Edwards v. Arizona*, 451 U.S. 477 (1981), where the suspect invokes his right to an attorney or right to remain silent, yet officials continue the interrogation. We need not address that question here.

10

apply.[5]

We need only address the Government's second argument to resolve this appeal. Because we conclude that the good faith exception applies, we need not determine whether probable cause supported the searches in the first place. *See, e.g.*, *United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars & Fifty-Seven Cents*, 307 F.3d 137, 145 (3d Cir. 2002) ("turn[ing] 'immediately to a consideration of the officers' good faith'" rather than first analyzing probable cause (quoting *Leon*, 468 U.S. at 925)); *see also Katzin*, 769 F.3d at 170.

### B. The Exclusionary Rule and Good Faith Exception

As required by *Leon* and its progeny, we apply the exclusionary rule only in those "unusual cases" where it may achieve its "remedial objectives": to appreciably deter unreasonable searches and seizures by law enforcement officers. *Leon*, 468 U.S. at 908, 918. The rule is designed to eliminate any incentive for officers to violate suspects' Fourth Amendment rights by prohibiting the admission of illegally seized evidence at trial. *Herring*, 555 U.S. at 139–40. By doing so, suppression "compel[s] respect for the [Fourth Amendment's] constitutional guaranty in the only effectively available way." *Elkins*, 364 U.S. at 217.

In determining whether to suppress the fruits of an unconstitutional search, we must undertake a "rigorous" cost-benefit analysis, weighing the "deterrence benefits of exclusion" against its "substantial social costs." *Davis v. United States*, 564 U.S. 229, 237–38 (2011); *accord Herring*, 555 U.S. at 141. Those costs include interfering with courts' truth-seeking function, and more specifically, concealing "reliable, trustworthy evidence bearing on guilt or innocence" and, in some instances, "set[ting] the criminal loose in the community without punishment." *Davis*, 564 U.S. at 237.

---

[5] The parties do not contest the part of the District Court's order denying Caesar's motion to suppress the bedsheets, pillowcases, underwear, and DNA sample. Accordingly, that part of the District Court order will be affirmed.

Exclusion is a "bitter pill," *id.*, swallowed only where it would result in a "substantial deterrent effect" that outweighs its resulting costs, *Leon*, 468 U.S. at 907 n.6.

The *Leon* good faith exception to the exclusionary rule effectuates this balance by forbidding suppression where officers act in "good faith" or "objectively reasonable reliance" on a search warrant later held to be defective. 468 U.S. at 922; *see also Katzin*, 769 F.3d at 171. Under these circumstances, where an officer acted illegally but did so "in the objectively reasonable belief that [his] conduct did not violate the Fourth Amendment," it is unlikely the threat of suppression would deter any future constitutional violations. *Leon*, 468 U.S. at 918. We do not exclude the fruits of unconstitutional searches in such cases because any marginal deterrent benefit is outweighed by its costs.

Since *Leon*, the Supreme Court has further refined the good faith exception, placing the culpability of the officer's misconduct at the center of the deterrence analysis. *See Herring*, 555 U.S. at 143; *Davis*, 564 U.S. at 238. It could be said that these more recent pronouncements in *Herring* and *Davis* have expanded the reach of the good faith exception and further narrowed the scope of the exclusionary rule. *See Davis*, 564 U.S. at 258–59 (Breyer, J., dissenting). Since the deterrent effect of exclusion "varies with the culpability of the law enforcement conduct" at issue, the exclusionary rule applies only where the official conduct is "sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 143–44. To trigger the exclusionary rule, law enforcement conduct must be "deliberate, reckless, or grossly negligent," or involve "recurring or systemic negligence." *Id.* at 144. "[S]imple, 'isolated' negligence," in turn, does not warrant suppression. *Davis*, 564 U.S. at 238.

Thus, "[t]he test for whether the good faith exception applies is 'whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.'" *United States v. Loy*, 191 F.3d 360, 367 (3d Cir. 1999) (quoting *Leon*, 468 U.S. at 922 n.23). Guided by *Herring* and *Davis*, we examine the totality of the

circumstances, "consider[ing] not only any defects in the warrant but also the officer's conduct in obtaining and executing the warrant and what the officer knew or should have known." *United States v. Franz*, 772 F.3d 134, 147 (3d Cir. 2014). In doing so, we bear in mind that police officers are not trained attorneys and generally cannot be expected to second-guess a magistrate's probable cause determination. *See Messerschmidt v. Millender*, 565 U.S. 535, 547 (2012). Accordingly, "[t]he mere existence of a warrant typically suffices to prove that an officer conducted a search in good faith," *United States v. Hodge*, 246 F.3d 301, 307–08 (3d Cir. 2001), and "will obviate the need for any deep inquiry into [the] reasonableness" of the officer's reliance on the warrant, *United States v. Stearn*, 597 F.3d 540, 561 (3d Cir. 2010) (internal quotation marks omitted).

In "rare circumstances," *id.*, however, a warrant may be so flawed that "the officer will have no reasonable grounds for believing that [it] was properly issued," *Leon*, 468 U.S. at 923 (footnote omitted). We have identified four such situations in which the good faith exception does not apply:

(1) where the magistrate judge issued the warrant in reliance on a deliberately or recklessly false affidavit;

(2) where the magistrate judge abandoned his or her judicial role and failed to perform his or her neutral and detached function;

(3) where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or

(4) where the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

*United States v. Tracey,* 597 F.3d 140, 151 (3d Cir. 2010); *see also Leon*, 468 U.S. at 923. According to Caesar and the District Court, this case presents the third exception to the good faith exception above. *Tracey*, 597 F.3d at 151.

13

*Leon* provided early guidance as to how the good faith exception can apply notwithstanding a warrant affidavit that lacks facts sufficient to establish probable cause. There, police officers initiated an investigation based on a confidential informant's tip that the defendants were selling drugs and later secured a facially valid warrant to search the defendants' homes and automobiles. *Leon*, 468 U.S. at 901–02. The court of appeals suppressed the evidence seized because the warrant application contained no information regarding the informant's reliability or the basis of his statements and accordingly failed to satisfy probable cause. *Id.* at 905. While declining to review the lower court's probable cause determination, the Supreme Court noted that the affidavit nevertheless relayed the details of the officers' "extensive investigation" and provided "much more than a 'bare bones' affidavit." *Id.* at 926. And as demonstrated by the divided panel opinions of the lower court, the affidavit "provided evidence sufficient to create disagreement among thoughtful and competent judges as to the existence of probable cause." *Id.* Accordingly, the Court held that the officers' reliance on the magistrate's probable cause determination was objectively reasonable, and that suppression would not advance the remedial purposes of the exclusionary rule. *Id.*

Although we decline to rule on probable cause, "the probable cause inquiry remains highly relevant" to our good faith analysis. *Stearn*, 597 F.3d at 562. In determining whether the good faith exception should apply, we examine whether an officer could reasonably believe that probable cause existed by assessing the facts in light of the relevant legal standards and pronouncements in applicable precedent. Under that precedent, probable cause is a "fluid concept," turning on "the factual and practical considerations of everyday life," which requires only a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 231–32, 238 (1983). As we explain below, the existence of probable cause here is a close question under our Fourth Amendment caselaw, but that does not preclude the determination that the officers acted in good faith.

### C. The Officers Seized the Images from Caesar's Home in Good Faith Reliance on the Initial Warrant

14

The question before us is whether the facts set forth in the initial affidavit of probable cause were so deficient that the officers' reliance on the accompanying warrant to search Caesar's home and electronic devices was entirely unreasonable.[6] Like the District Court, we are mindful of our opinions in *Zimmerman* and *John*. Both those cases address the extent to which police officers can reasonably rely on warrants supported, in part, by police officers' statements about the tendency of child sexual abusers to possess child pornography. In both cases, divided panels concluded that the good faith exception did not apply. However, *Zimmerman* and *John* are distinguishable on their facts, and they do not persuade us that the first affidavit was so obviously defective that no reasonable officer would have believed there was probable cause to search for child pornography and images of Caesar's sexual abuse victims. Moreover, given the Supreme Court opinions in *Herring* and *Davis*, both of which were controlling when the warrant was issued, we cannot conclude that the officers' conduct in seizing and searching the devices was sufficiently flagrant to justify suppression of the images.

1.

Because the District Court's reasoning relied almost entirely on our precedent in *Zimmerman* and *John*, we will discuss those opinions in some detail.

In *Zimmerman*, the police secured a warrant to search the home of the defendant, a high school teacher and coach, for evidence of sexual abuse of minors, including adult pornography and child pornography. 277 F.3d at 429–30. The affidavit of probable cause included three categories of information. First, some of Zimmerman's students alleged that he had sexually abused them at school and on athletics road trips. *Id.* at 430–31. Second, some current students and one former student stated that Zimmerman had shown them adult pornography at Zimmerman's home six and ten months before the warrant application. *Id.* at 430, 434. Third, the affidavit related a postal inspector's opinion that "persons with a sexual interest in children may possess child pornography and keep it in their homes for extended periods of time." *Id.* at 431.

---

[6] We address the third warrant in Part III.C.3, *infra*.

During the search of Zimmerman's home, police seized several images of child pornography, among other items. *Id.*

We held that the affidavit failed to set forth probable cause to search for child pornography and that the good faith exception did not apply. *Id.* at 429. As to probable cause, we noted that the warrant application "contained no information that Zimmerman had ever purchased or possessed child pornography," and that "there was absolutely no information in the affidavit . . . indicating that child pornography was—or ever had been located [in his home]." *Id.* at 432–33. Because the Government conceded that the police lacked probable cause, we declined to determine how much weight, if any, to attribute to the postal inspector's statement about the molestation-child pornography connection. *Id.* at 433 n.4. We noted, however, that "there [was] nothing" in the postal inspector's statement about Zimmerman, the facts of his case, or the results of the investigation. *Id.* at 434. And without additional factual support, such "[r]ambling boilerplate recitations [regarding a molestation-pornography link] . . . may have added fat to the affidavit, but certainly no muscle" in the probable cause calculus. *Id.* at 433 n.4 (internal quotation marks and citation omitted).

The good faith exception did not apply because the affidavit was "clearly insufficient" and "it was 'entirely unreasonable' for an official to believe to the contrary." *Id.* at 437. We reached that conclusion because—having already rejected the postal inspector's statements—the only information linking pornography of any kind to Zimmerman's residence was a single stale allegation that Zimmerman had stored a video of adult pornography on his home computer. *Id.*

Then-Judge Alito, who would later write the majority opinion for the Supreme Court in *Davis*, dissented. He reasoned that, even if the warrant did not state "fresh probable cause" to search for child pornography, the majority improperly refused to apply the good faith exception. *Id.* at 438 (Alito, J., dissenting). Pointing to Zimmerman's "allegedly extended course of conduct with the students and his use of [adult] sexual materials in carrying out that course of conduct," the dissent concluded that the affidavit provided *some* evidence that Zimmerman would possess "similar

16

materials" in his home at the time of the search. *Id.* at 440. Unlike the majority, the dissent declined to opine whether the affidavit "provided fresh probable cause." *Id.* But because "there is no bright line between fresh and stale probable cause," the dissent concluded that this case did not present one of the "rare circumstances in which, although a neutral magistrate has found that there is probable cause, a lay officer executing the warrant could not reasonably believe that the magistrate was correct." *Id.*

Unlike *Zimmerman*, *John* involved a warrant application that lacked any express statement about the link between molestation and pornography but nonetheless relied on an unsupported inference that child abusers often collect child pornography. There, the officer applied for a warrant to search the home of John, a teacher, after some of his sixth-grade students reported that he had sexually assaulted them in his classroom. *John*, 654 F.3d at 414. The students claimed that John maintained two notebooks where he kept "inappropriate" notes about his female students, which he brought to and from school each day. *Id.* The warrant sought permission to collect the notebooks and child pornography. *Id.*

We held that the affidavit was "wholly lacking in probable cause[] because [e]ven a cursory reading of [the] affidavit reveals that there is not a single assertion that John was in any way associated with child pornography." *Id.* at 419 (second alteration in original) (internal quotation marks omitted). The allegations that John had committed sex crimes on school property and that "he kept two particular pieces of evidence of those crimes in his home" were inadequate "to establish—or even to hint at—probable cause as to the wholly separate crime of possessing child pornography." *Id.* Accordingly, the affidavit needed to allege the existence of an "assault-pornography correlation" explicitly and state the basis for the allegation. *Id.* Such a statement might be supported by "studies . . . show[ing] that a correlation exists between one crime and the other," or "perhaps extensive investigatory experience." *Id.* at 420. But because the affidavit did not include either, we would not permit the officer to infer a connection between two distinct crimes to support a showing of probable cause or a good faith determination. *Id.*

Judge Fuentes dissented. Underscoring the Supreme Court's then-recent opinions in *Herring* and *Davis*, he concluded that the officer's conduct was not sufficiently culpable to warrant the suppression remedy. *Id.* at 423 (Fuentes, J., dissenting). He reasoned that, given the shortage of circuit court opinions addressing analogous fact patterns at the time of the search, a reasonably well-trained police officer would have acted just as the officer did: "[S]he would submit a request to a judge asking whether there is probable cause for a warrant. And, lacking legal training herself, she would then rely on that judicial determination to do her job." *Id.* at 425. The dissent observed that even subsequent court of appeals opinions addressing the question presented—whether probable cause to believe someone has molested a child "automatically" supplies probable cause to believe that person possesses child pornography—"provide[d] conflicting guidance." *Id.* (citing *United States v. Hodson*, 543 F.3d 286, 292–93 (6th Cir. 2008); *United States v. Falso*, 544 F.3d 110, 122, 125 (2d Cir. 2008); and *United States v. Colbert*, 605 F.3d 573, 578–79 (8th Cir. 2010)). And if "even judges, steeped in law and acting in the utmost good faith, can have different opinions on the issue . . . it was not objectively unreasonable—let alone, *entirely unreasonable*—for [the officer] to take one side of the controversy over the other, even if we now disagree with that decision." *Id.* According to the dissent, suppression would not adequately deter officers from making such a mistake, and the good faith exception should therefore apply. *Id.*

2.

With these precedents in mind, we turn to the facts of this case. Here, the District Court faulted Gallina's initial warrant application for many of the same deficiencies of the *Zimmerman* and *John* warrants, even concluding that, as in those cases, "nothing in the first affidavit hinted that Caesar ever had child pornography or images of the victims in his home." *Caesar*, 2019 U.S. Dist. LEXIS 206763, at *16. The court further held that the only "conceivable bases" for probable cause to search for child pornography "were the 'unexamined biases and stereotypes' Gallina briefly mentioned in the affidavit." *Id.* at *20 (quoting *John*, 654 F.3d at 421). We are not so sure.

18

Setting aside Gallina's statements about the link between molestation and pornography for now, we conclude that the initial affidavit provided more than the "bare bones" or "paltry" affidavits that preclude good faith reliance. *United States v. Pavulak*, 700 F.3d 651, 664 (3d Cir. 2012); *Zimmerman*, 277 F.3d at 438. As in *Leon*, the affidavit detailed the origin of Gallina's investigation and the multiple steps officers took leading to the issuance of the initial warrant: the receipt of the NCMEC tip, review of the eBay messages and associated IP address, verification of Caesar's driver's license records, and four interviews with Caesar's landlord, the victims, and victims' mother. *See* 468 U.S. at 901. By relying on interviews that were conducted only days before the search, the affidavit supplied more than a solitary piece of stale evidence. *See Zimmerman*, 277 F.3d at 437. Moreover, the affidavit was not merely based upon a single uncorroborated anonymous tip, *see United States v. Williams*, 3 F.3d 69, 73–74 (3d Cir. 1993), or an officer's conclusory statement that he believed probable cause existed, *see Pavulak*, 700 F.3d at 664.

Indeed, the existence of probable cause to search for sexually explicit images presents a closer question here than in *Zimmerman* and *John*, where we concluded with little trouble that probable cause was absent. The initial affidavit stated a stronger basis than the warrant applications in both those cases—namely because it included detailed allegations that Caesar sexually abused the two brothers not in school, but in his home for over two years, and because Caesar used eBay to seek out images of children in various stages of undress. Taking these facts together, the affidavit contained *some* basis for believing Caesar had sexually explicit images of children in his house. The third exception to the good faith exception, for affidavits "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," is therefore of questionable applicability. *Tracey*, 597 F.3d at 151.

The District Court's primary criticism of the affidavit was that it failed to formally accuse Caesar of violating Pennsylvania's child pornography statute[7] and identified no

---

[7] *See* 18 Pa. Cons. Stat. § 6312(c), (d), (g) (prohibiting the dissemination, viewing, and possession of child pornography).

direct evidence that Caesar took photos of his victims or kept child pornography in his home—the two categories of images identified in the warrant application. But therein lies the rub. "[D]irect evidence linking the place to be searched to the crime is not required" to establish probable cause. *Hodge*, 246 F.3d at 305 (alteration in original) (internal quotation marks omitted). Rather, probable cause to search for an item "can be, and often is, inferred by 'considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide'" the fruits of his crime. *United States v. Jones*, 994 F.2d 1051, 1056 (3d Cir. 1993) (citation omitted); *see also United States v. Price*, 558 F.3d 270, 282 (3d Cir. 2009). Whether or not they were enough to satisfy probable cause, the allegations about Caesar's prolonged sexual abuse of the two brothers and his interest in photos of children in various stages of undress supported the reasonableness of the officers' belief that probable cause existed.

First, Gallina's affidavit set forth a connection between Caesar's sexual interest in children and the site of the search where the electronic equipment was located. In *Zimmerman* and *John*, nearly all the alleged sexual abuse occurred at the schools where the defendants worked. In contrast, the alleged sexual abuse here occurred exclusively in the defendant's home, in his bedroom, several times over two years, ending only weeks before the search. As the District Court noted, the affidavit did not claim that Caesar photographed the brothers or used child pornography in aid of his sexual abuse. The brothers' allegations could nevertheless lead a reasonable officer to believe there was a critical link between the defendant's pursuit of sexual gratification via children and possession of equipment containing explicit images of children in his home. That link was certainly closer than in *Zimmerman* and *John*.

The strong allegations tying child molestation to Caesar's home are particularly significant as they relate to the search for images of Caesar's victims. As described in the warrant application, such images would have constituted evidence of the allegations of child molestation. Significantly, Caesar concedes on appeal that the affidavit set forth probable cause to search for physical evidence of sexual abuse in his

20

home. While not necessarily sufficient to establish probable cause, the facts supporting that search would tend to support a further search, in the same location, for related evidence of the same crime—including photographs of the crime victims. The fact that Caesar allegedly abused the brothers in his home and kept their used underwear also provided a basis for believing that he would have kept other mementos of the boys in his house.

Second, and arguably more importantly, the affidavit recounted Caesar's interest in images of partially dressed minors and the steps he took to secure such images. Gallina averred that Caesar, a single man with no children, bid on used children's underwear and swimwear and, in at least two instances, requested videos or photos of children modeling the posted clothing items. The District Court summarily dismissed these communications and any images Caesar might have received[8] as stale because they were at least six months old as of the search in January 2018. Again, we are not so sure. Although the "[a]ge of the information supporting a warrant application is a factor in determining probable cause . . . , [a]ge alone . . . does not determine staleness." *United States v. Harvey*, 2 F.3d 1318, 1322 (3d Cir. 1993) (citations omitted). Rather than simply count the "months between the facts relied on and the issuance of the warrant," *id.* (citation omitted), we must also consider "a number of variables, such as the nature of the crime, of the criminal, of the thing to be seized, and of the place to be searched," *United States v. Williams*, 124 F.3d 411, 420 (3d Cir. 1997) (quoting *United States v. Tehfe*, 722 F.2d 1114, 1119 (3d Cir. 1998)).

Gallina could reasonably have downplayed the six-month gap in time between the NCMEC tip and warrant application because "pedophiles rarely, if ever, dispose of child pornography." *Zimmerman*, 277 F.3d at 434. Such evidence is therefore less likely to grow stale. *See United States v. Vosburgh*, 602 F.3d 512, 529 (3d Cir. 2010) ("[I]nformation

---

[8] Although the District Court referred to the "eBay images," we note that the initial affidavit failed to clearly state whether Caesar received any images from other eBay users in response to his solicitations. *See Caesar*, 2019 U.S. Dist. LEXIS 206763, at \*19, n.5.

21

concerning [child pornography] crimes has a relatively long shelf life."); *United States v. Shields*, 458 F.3d 269, 279 n.7 (3d Cir. 2006) (nine-month-old evidence that defendant participated in online groups sharing child pornography was not stale). While Gallina did not specifically allege that Caesar's eBay messages contained child pornography, the child-focused sexual nature of the messages was obvious based on the other information in the affidavit. In one of its most graphic portions, the affidavit stated that after receiving a message from Caesar soliciting children's undergarments, another eBay user replied, "If you buy it I will lube it and cum into [it] for you in skype real show and you can watch this." App. 49. Clearly, the NCMEC, Gallina, and magistrate judge were not alone in detecting Caesar's infatuation with children and the sexual intentions behind his eBay messages. The role these communications played in Caesar's sexual pursuits could reasonably suggest that he would not quickly discard them.

That Caesar sought out the images of partially dressed children by using a computer further counsels that the messages might not have been stale at the time of the officers' search. We have observed that images and files stored on computers are "not the type of evidence that rapidly dissipates or degrades." *Vosburgh*, 602 F.3d at 529. Electronic files can remain indefinitely on computer devices, and digital forensic investigators often recover such evidence long after it is deleted. *Id.*; *see also United States v. Gourde*, 440 F.3d 1065, 1071 (9th Cir. 2006) (en banc) (noting the "long memory of computers"). It is therefore, at minimum, a close question whether this evidence was stale at the time of the search. *See Zimmerman*, 277 F.3d at 440 (Alito, J., dissenting) ("[T]here is no bright line between fresh and stale probable cause.").

We view these averments as something more than the "nothing" that the District Court concluded. *Caesar*, 2019 U.S. Dist. LEXIS 206763, at *16. Instead, Caesar's eBay activity, taken together with the detailed allegations of ongoing and contemporaneous sexual abuse in his house, could indicate his interest in pursuing visual sexual stimulation online. It was not entirely unreasonable to believe that Caesar, an individual who had sought to obtain photos of partially dressed children, would likely possess such photos—or perhaps more explicit photos—in the place where he pursued his physical sexual

22

interests with the two brothers. Evaluating these facts in totality, as required, we disagree with the District Court's assessment. *See D.C. v. Wesby*, 138 S. Ct. 577, 588 (2018) ("Our precedents recognize that the whole is often greater than the sum of its parts—especially when the parts are viewed in isolation.").

The District Court was also critical of Gallina's statements, from his purported experience, about the link between molestation and possession of child pornography. In both *John* and *Zimmerman* we expressed skepticism about the existence of an "intuitive relationship" between child sexual abuse and child pornography. *John*, 654 F.3d at 422; *Zimmerman*, 277 F.3d at 433 n.4. Even in his dissent in *John*, Judge Fuentes acknowledged that the evidence of a correlation between the two offenses is "mixed." *John*, 654 F.3d at 423 n.2 (Fuentes, J., dissenting). But in assessing whether Gallina acted in good faith, we cannot ignore the volume of social science research and legal authority discussing the tendency of child sexual abusers to possess child pornography. The legislature has also weighed in on this question. In support of the Child Pornography Prevention Act of 1996, Congress issued findings that "child pornography is often used by pedophiles and child sexual abusers to stimulate and whet their own sexual appetites, and as a model for sexual acting out with children." Pub. L. No. 104-208, § 121, 110 Stat. 3009 (1996); *see also* S. Rep. No. 104-358, at 12–13 (1996) ("Law enforcement investigations have verified that pedophiles almost always collect child pornography or child erotica."). More recently, the United States Sentencing Commission has commented on the frequency of "criminal sexually dangerous behavior"[9] among child pornography offenders. U.S. Sent'g Comm'n, Federal Child Pornography Offenses 169 (2012) ("Sentencing Commission Report"). According to the Commission, social scientists have reached "varying conclusions" on this issue, but a consensus has identified "some correlation between viewing child pornography and sex

---

[9] As defined in the Sentencing Commission Report, "criminal sexually dangerous behavior" consists of "contact" sex offenses, "non-contact" sex offenses, and certain prior non-production child pornography offenses. Sent'g Comm'n Rep. at 174.

offending." *Id.* at 102, 169; *see also id.* at 171–74 (canvassing the scholarship).

Several of our sister circuits have favorably cited these findings in other contexts,[10] and some have even called the molestation-pornography nexus "common sense," *United States v. Byrd*, 31 F.3d 1329, 1339 (5th Cir. 1994), or "intuitive," *Colbert*, 605 F.3d at 578. Guided by our opinion in *John*, we do not go that far. We nevertheless credit the weight of these authorities in concluding it was not entirely unreasonable for an officer to believe the initial affidavit set forth probable cause to search for the images.

As we explained in *John*, the existence of a molestation-pornography correlation is a factual question. And in *John* we noted that officers who rely on this correlation must offer a factual basis for the magistrate judge to evaluate independently. *See* 654 F.3d at 419–20. Gallina did just that, or attempted to do so. He explicitly relied on his experience and training to conclude that child sexual abusers tend to possess child pornography. The District Court rejected these statements about the molestation-pornography connection as insufficient "boilerplate" that was not "tailor[ed]" to the facts of this case. *Caesar*, 2019 U.S. Dist. LEXIS 206763, at *18. But Gallina clearly attempted to support his belief in the molestation-pornography nexus by reciting his lengthy experience conducting criminal investigations and the

---

[10] *See United States v. Lebovitz*, 401 F.3d 1263, 1271 (11th Cir. 2005) (citing Congress's factual findings in affirming the defendant's sentence under the Sentencing Guidelines); *United States v. Brand*, 467 F.3d 179, 198 (2d Cir. 2006) (citing congressional findings in holding that evidence of child pornography was admissible under Federal Rule of Evidence 404(b), in part because "child pornography shares a strong nexus with pedophilia"); *see also Byrd*, 31 F.3d at 1339 (rejecting defendant's entrapment argument because "common sense would indicate that a person who is sexually interested in children is likely to also be inclined, i.e., predisposed, to order and receive child pornography"); *Colbert*, 605 F.3d at 578 ("Child pornography is in many cases simply an electronic record of child molestation.").

extensive list[11] of investigative training courses he had completed. By providing this exhaustive summary, Gallina at the very least tried to comply with *John*'s requirements, further supporting our conclusion that he searched for the images in good faith.

Even if it was questionable whether there existed probable cause to search for the images, Gallina's reliance on the initial warrant and his conduct securing the warrant did not approach the standard of gross negligence required to trigger the exclusionary rule. *See Franz*, 772 F.3d at 147. We have described gross negligence generally "as the want of even scant care and the failure to exercise even that care which a careless person would use." *United States v. Wright*, 777 F.3d 635, 640 (3d Cir. 2015) (quoting *Fialkowski v. Greenwich Home for Children, Inc.,* 921 F.2d 459, 462 (3d Cir.1990)).

---

[11] The full list of courses included the following: Criminal Behavior Assessment; Basic Narcotics Investigator; Identifying Deceptive Behavior; First Contact ("detailing behaviors and tendencies of suspects during interdictions of a traffic stop"); Current Drug Trends; Commercial Vehicle Interdiction; Passenger Vehicle Interdiction; Conducting Complete Traffic Stops; Operation Safe Highways Initiative for Effective Law Enforcement Detection; Background Investigator; Wiretap 'A' Certification; Cell Phone Use in Drug Investigations; Interview and Interrogation; Statement Analysis ("detailing techniques and methods at identifying and analyzing truthful and deceptive written and verbal statements"); Ritual Homicide Investigation; and Violent Crime Behavioral Analysis ("utilizing behavioral analysis in identifying, analyzing, and investigating homicides, child abductions, and kidnappings"). App. 48.

While Gallina lacked experience investigating sex offenses such as the ones in this case, the summary of his background analyzing criminal behavior in other contexts and his generally applicable training satisfied *John*'s basic requirements. Coupled with his obvious familiarity and personal connection with the facts of this case, *contra Zimmerman*, 277 F.3d at 433 n.4, Gallina's statements linking child molestation to child pornography were adequately tailored to support a good faith determination.

Based on the record, we cannot say that Gallina acted without "even scant care" in the execution of the first warrant. *Id.* As required, he submitted a warrant application that set forth several facts tending to show that child pornography and images of sexual abuse victims might be found in Caesar's house. "[T]hose facts presented the magistrate with the judgmental task of evaluating their cumulative significance and testing it against the legal standard of probable cause." *Williams*, 3 F.3d at 74. Where, as here, probable cause presents a close judgment call, we conclude that suppression would not meaningfully deter future Fourth Amendment violations. Once the magistrate judge makes the call in such cases, officers are entitled to rely on it and execute the authorized search without sanction.[12]

3.

Caesar urges that the images must nonetheless be suppressed because they were recovered from his electronic devices only after execution of the third warrant. As discussed above, that warrant's affidavit of probable cause was based in

---

[12] Caesar argues that reversing the District Court would "open[] the door to assume that every person accused of child molestation is automatically under investigation for child pornography." Appellee's Br. 31. These concerns are misplaced. Our good faith determination does not disturb a key principle of our holdings in *Zimmerman* and *John*: that probable cause to believe a defendant engaged in child molestation, alone, cannot establish probable cause to search for evidence of the separate crime of possessing child pornography. *See Falso*, 544 F.3d at 122, 128 (holding that the affidavit failed to state probable cause because it relied on a "fallacious inference" linking child sexual abuse to child pornography, but applying the good faith exception because "[probable cause] is certainly an issue upon which reasonable minds can differ"); *cf. United States v. Edwards*, 813 F.3d 953, 966, 972 (10th Cir. 2015) (concluding that probable cause was lacking because the affidavit relied on a "logically fallacious" link between possession of child pornography and other "pedophilic tendencies," but applying the good faith exception because the link "[was] not so obviously unsound that it rendered reliance on the warrant objectively unreasonable").

part on a summary of the items seized in the search of Caesar's home and Caesar's post-invocation admissions that he viewed child pornography on some of the electronic devices. Caesar argues that the third warrant was therefore tainted by the unlawful seizure of the devices and illegally obtained confession and that it failed to independently supply probable cause to search the devices themselves. This argument ignores the fact that the initial warrant expressly permitted a search for the digital images themselves. *See* App. 47 (authorizing a search for the specified images "in any form . . . [including those] *stored on personal electronic devices*" (emphasis added)); *see also United States v. Gregoire*, 638 F.3d 962, 967–68 (8th Cir. 2011) ("A search warrant which specifically authorized the seizure of a computer and a search for financial records clearly contemplates at least a limited search of the computer's contents without the need of a second warrant." (internal quotation marks omitted)).

Even if a warrant lacks such express authorization, courts have routinely upheld subsequent searches of legally seized electronic equipment. Multiple circuit courts have recognized that "a second warrant to search a properly seized computer is not necessary where the evidence obtained in the search did not exceed the probable cause articulated in the original warrant." *United States v. Evers*, 669 F.3d 645, 652 (6th Cir. 2012) (internal quotation marks omitted); *see also United States v. Upham*, 168 F.3d 532, 536 (1st Cir. 1999) ("The extraction of unlawful images from within the computer and diskettes was . . . contemplated by the warrant" where "[t]he warrant explicitly authorized the seizure of both the computer plus diskettes and the unlawful images" and "[t]he images . . . were 'inside' the computer or diskettes.").[13] Accordingly, we do not believe a distinction between the devices and images is warranted for purposes of our good faith inquiry. Because the initial warrant permitted both the seizure and search of the electronic devices and supported the officers'

---

[13] Those holdings accord with Federal Rule of Criminal Procedure 41, which provides that, unless otherwise specified, a warrant authorizing the seizure of electronic storage media also "authorizes a later review of the media or information consistent with the warrant." Fed. R. Crim. P. 41(e)(2)(B).

good faith reliance, the third warrant was unnecessary to review the contents of the devices.

In reaching this conclusion, we recognize Gallina's egregious conduct during his interrogation of Caesar. Caesar invoked his right to remain silent at least six times, but Gallina continued to question him about the sexual abuse allegations and electronic devices seized during the search of his home. Caesar urges that this misconduct reflects Gallina's "overly aggressive and illegal" approach to the investigation *as a whole* and that such conduct was sufficiently culpable to warrant suppression of the images. Appellee's Br. 43. But Gallina's misconduct following the seizure of the devices does not alter our conclusion that he and the other officers relied on the initial warrant in good faith. *Cf. United States v. Crews*, 445 U.S. 463, 475 (1980) ("The exclusionary rule enjoins the Government from benefiting from evidence it has unlawfully obtained; it does not reach backward to taint information that was in official hands prior to any illegality."). Once the officers seized the devices, they were also entitled to search the devices, as explicitly authorized by the magistrate judge.[14]

---

[14] Because we conclude that the third warrant was superfluous, we need not decide whether Caesar's ill-gotten confession or any of the evidence seized under the first warrant might have tainted the third warrant such that it could not support an officer's good faith reliance. That question—whether the good faith exception may apply to a warrant issued on the basis of evidence derived from an earlier constitutional violation—is not one that we have squarely addressed. We note, however, that several of our sister circuits have held that the good faith exception may, under certain circumstances, overcome the taint of earlier unconstitutional conduct. *See United States v. Massi*, 761 F.3d 512, 525–28 (5th Cir. 2014); *United States v. McClain*, 444 F.3d 556, 564–566 (6th Cir. 2005); *United States v. Fletcher*, 91 F.3d 48, 51–52 (8th Cir. 1996); *United States v. Thomas*, 757 F.2d 1359, 1368 (2d Cir. 1985). *But see United States v. McGough*, 412 F.3d 1232, 1239–40 (11th Cir. 2005) (holding that the good faith exception did not apply where the officer presented tainted evidence in support of a warrant application); *United States v. Vasey,* 834 F.2d 782, 789–90 (9th Cir. 1987) (same).

We will not punish the Government because Gallina took the extra step of securing an unnecessary warrant but then committed serious errors in doing so. Given our conclusion that an officer could rely on the first warrant in good faith, suppressing the images based on the third warrant's flaws would put the Government in a worse position than if the officers had simply searched the devices immediately upon seizing them. *Cf. Nix v. Williams*, 467 U.S. 431, 443–44 (1984) (holding that the benefits and costs of the exclusionary rule "are properly balanced by putting the police in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred"). Excluding the images under these circumstances would not meaningfully deter future Fourth Amendment violations. On the contrary, suppression might discourage police officers from seeking judicial authorization for follow-up searches in cases where, unlike here, an additional warrant is actually needed. We therefore conclude that the images should not be suppressed.

## IV. CONCLUSION

For the foregoing reasons, we will reverse that part of the District Court's order suppressing the images of child pornography and images of sexual abuse victims seized from Caesar's electronic devices. The District Court's order will be affirmed in all other respects. The case will be remanded to the District Court for further proceedings consistent with this opinion.