PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-1038
_____

UNITED STATES OF AMERICA

v.

TYKEI GARNER,
            Appellant

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 1-16-cr-00341-002)
District Judge: Honorable John E. Jones III
_____

No. 19-1326
_____

UNITED STATES OF AMERICA

v.

JERRY FRUIT,
            Appellant
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 1-16-cr-00341-001)
District Judge: Honorable John E. Jones III
_____

Argued January 14, 2020
Before: HARDIMAN, PORTER, and PHIPPS, *Circuit Judges*.

(Opinion Filed: May 29, 2020)


John F. Yaninek [Argued]
Thomas Thomas & Hafer
305 North Front Street
6th Floor
Harrisburg, PA 17101
    *Attorney for Appellant Tykei Garner*

Keith M. Donoghue [Argued]
Federal Community Defender Office for the Eastern District
of Pennsylvania
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA 19106
    *Attorney for Appellant Jerry Fruit*

David J. Freed
Scott R. Ford [Argued]
Office of United States Attorney
Middle District of Pennsylvania
228 Walnut Street, P.O. Box 11754
220 Federal Building and Courthouse
Harrisburg, PA 17108
    *Attorney for Appellee United States of America*

————————

OPINION OF THE COURT

————————

HARDIMAN, *Circuit Judge*.


    These consolidated appeals require us to determine whether a Pennsylvania state trooper unlawfully prolonged a traffic stop. Appellants Jerry Fruit and Tykei Garner challenge the District Court's denial of their joint motion to suppress evidence, claiming the traffic stop violated their Fourth Amendment right to be free from unreasonable seizures. Garner also claims the District Court erred when it allowed the Government to use his prior drug conviction as Rule 404(b) evidence. Finally, Garner contends the evidence was insufficient to convict him of a conspiracy to distribute heroin and cocaine. We will affirm.

I

    On July 5, 2016, Pennsylvania State Trooper Kent Ramirez stopped a car with a New York license plate for speeding on Interstate 81 near Harrisburg, Pennsylvania. Prior

3

to the stop, Trooper Ramirez ran the license plate and learned the car was owned by Enterprise Rent-A-Car, though it lacked the typical bar code rental stickers.

The entire traffic stop was recorded on Trooper Ramirez's dashcam. When Ramirez approached the passenger side of the vehicle, he smelled a strong odor of air freshener and noticed that each vent had an air freshener clipped to it. Ramirez identified himself, asked for the driver's license, and explained that the driver was going 75 miles per hour in an area with a posted speed limit of 55. Because traffic was noisy, Ramirez asked the driver to exit the vehicle so they could talk on the side of the road.

The driver identified himself as Jerry Fruit and gave Ramirez his driver's license and rental car agreement. In response to an inquiry from Ramirez, Fruit said he was traveling from Manhattan to Hagerstown, Maryland to visit his cousin for about two days. He also identified his passenger, Tykei Garner, as his cousin. The rental agreement listed Fruit as the authorized driver of the vehicle, but limited to the state of New York. And the agreement stated that it covered a rental period of June 11–15, so it appeared to have expired twenty days before the traffic stop. *Id.* When Ramirez asked about that discrepancy, Fruit explained that he was in a car accident, his car had been in the shop for a month, and the rental agreement was through his insurance company.

Before he returned to his cruiser to run Fruit's license and contact Enterprise about the status of Fruit's rental contract, Trooper Ramirez asked Fruit a series of questions about his employment, prior traffic tickets, and criminal history. Fruit asked Ramirez what these questions had to do with his speeding violation, and Ramirez responded that the

4

questions were "part of [his] traffic stop, okay?" App. III, Traffic Stop Video at 7:26–7:28.

About six minutes after he stopped the car, Trooper Ramirez asked the passenger (Garner) to get out of the car so he could question him. Garner responded that Fruit was dropping him off in Greencastle, Pennsylvania to visit his girlfriend, but said he would return to New York the next day to attend a court hearing.[1] He also admitted he had a suspended license for failure to pay child support. When Ramirez continued to ask him about his criminal history, Garner added that he had been arrested for fighting. Garner also clarified that Fruit was not his biological relative, though he considered him family. As with Fruit, Ramirez asked Garner questions unrelated to the traffic stop, including about his criminal history.

Twelve minutes into the traffic stop, Trooper Ramirez returned to his vehicle to check with Enterprise on the status of the rental agreement and to verify Fruit's and Garner's driving records and criminal histories. Ramirez later explained at the suppression hearing that he had to input their information into his computer manually, which could take between twelve to fifteen minutes for two people. Ramirez learned from the computer search that neither Fruit nor Garner had any outstanding warrants, although Fruit was on supervised release

---

[1] The District Court found that Garner said they would be returning for court the next day while Fruit said he was going to Maryland for about two days. That finding is clearly erroneous. When Ramirez asked Garner if they were coming back together, Garner said: "Actually, *I* have to go to court" for "child support. . . . Headed back tomorrow, hopefully." Traffic Stop Video at 9:37–9:46 (emphasis added).

for a federal crime. He also learned that both men had extensive criminal records, including drug and weapons crimes. Ramirez then called the Pennsylvania Criminal Intelligence Center, which reported that both men had been subjects of high intensity drug trafficking area investigations. Finally, Enterprise confirmed that Fruit had extended the rental agreement beyond the listed expiration date.

After learning all these things, Trooper Ramirez resolved to ask permission to search the vehicle but waited for backup before doing so. The backup officer, Trooper Severin Thierwechter, arrived 37 minutes into the stop, at about 9:29 pm. Trooper Ramirez then asked Fruit if he could search the car, but Fruit declined. Ramirez responded that he had "enough to believe that there may be criminal activity going on." Traffic Stop Video at 37:55–37:59. Ramirez then advised Fruit that he was calling for a K-9 unit and Fruit was not free to leave. At 9:31 p.m., Ramirez called for a K-9 unit, and Trooper John Mearkle arrived with dog Zigi 17 minutes later—56 minutes into the stop. Ramirez told Mearkle that he suspected criminal conduct because Fruit and Garner gave "conflicting stories," had "long criminal histories," and were "very nervous." Traffic Stop Video at 58:33–58:45. When Mearkle brought Zigi to the car, Zigi alerted twice at the passenger side door. Zigi then entered the vehicle and alerted in the back seat and trunk. The troopers searched the car themselves and found bags containing 300 grams of cocaine and 261 grams of heroin in the trunk. So they arrested Fruit and Garner.

Fruit and Garner were indicted for conspiracy to possess with intent to distribute heroin and cocaine and possession with intent to distribute heroin and cocaine. They moved to suppress the evidence seized during the traffic stop, arguing that they were seized in violation of their Fourth Amendment rights

6

because Trooper Ramirez extended the traffic stop longer than was necessary to issue the speeding ticket and lacked reasonable suspicion to engage in the ensuing criminal investigation. The District Court denied their motion, ruling that Trooper Ramirez had "an escalating degree of reasonable suspicion" that justified extending the stop. Fruit App. 26.

In 2018, Fruit pleaded guilty to both counts under a plea agreement preserving his right to appeal the denial of his motion to suppress. Garner was convicted of both counts by a jury. Garner moved for judgment of acquittal and a new trial, which the District Court denied. The Court sentenced Fruit and Garner each to the mandatory minimum of 120 months' imprisonment with both counts to run concurrently. They appealed and we consolidated their cases for argument and disposition.

## II

The District Court had jurisdiction under 18 U.S.C. § 3231 and we have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). We review the District Court's factual findings in support of its order denying the motion to suppress for clear error and its legal determinations de novo. *United States v. Lewis*, 672 F.3d 232, 236-37 (3d Cir. 2012). Because the District Court denied the suppression motion, we view the facts in the light most favorable to the Government. *United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002).

## III

We begin by addressing Fruit and Garner's argument that the District Court erred when it denied their motion to suppress evidence. Trooper Ramirez paced Fruit driving 75

7

miles per hour in a 55 mile per hour zone, so there is no dispute that the initial traffic stop was lawful. The question here is whether it became unlawful because it was "prolonged beyond the time reasonably required to complete th[e] mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

The Supreme Court has stated that the Fourth Amendment allows an officer to conduct unrelated investigations that do not lengthen a roadside detention. *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). But if these investigations "measurably extend the duration of the stop," the seizure becomes unlawful unless otherwise supported by reasonable suspicion or probable cause. *Id*. at 333 (internal citation omitted). The lawful seizure "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (citing *United States v. Sharpe*, 470 U.S. 675, 686 (1985)).

*Rodriguez* is the precedent most relevant to this appeal. There, K-9 officer Morgan Struble stopped Rodriguez for driving erratically. 575 U.S. at 351. After Struble checked Rodriguez's license, registration, and proof of insurance, he returned to the car, asked for the passenger's license, and questioned the occupants about their travel plans. *Id*. Struble ran the passenger's license, found no outstanding warrants or other problems, and called for backup. He returned the documents to Rodriguez and the passenger and completed the traffic stop by issuing Rodriguez a written warning. But instead of sending Rodriguez on his way, Struble asked permission to walk his dog around the vehicle. *Id*. at 352. When Rodriguez refused, Struble ordered the occupants to exit the vehicle while he waited for backup. After the second officer arrived, Struble then searched the car and the dog alerted to the presence of

drugs some seven or eight minutes after he issued the written warning to Rodriguez. *Id*.

The Supreme Court held that an officer may not extend the stop to conduct a dog sniff unless there is reasonable suspicion of criminal activity beyond the traffic violation. *Id*. at 357–58. It observed that an officer's mission when making a traffic stop includes determining "whether to issue a traffic ticket" and making "'ordinary inquiries incident to the traffic stop.'" *Id*. at 355 (quoting *Caballes*, 543 U.S. at 408). A dog sniff aimed at "detecting evidence of ordinary criminal wrongdoing" unrelated to the stop "is not fairly characterized as part of the officer's traffic mission." *Id*. at 355–56 (internal citation, quotation marks, and alteration omitted).

A

This Court has issued two opinions in the wake of *Rodriguez*: *United States v. Clark*, 902 F.3d 404 (3d Cir. 2018), and *United States v. Green*, 897 F.3d 173 (3d Cir. 2018). In *Clark*, we held a lawful traffic stop was unlawfully extended when an officer began unreasonably questioning a driver about his criminal history after tasks tied to the mission of the traffic stop "reasonably should have been[] completed." 902 F.3d at 410 (internal citation omitted). Although the officer questioned the driver for just 20 seconds, we noted that the brevity of the questioning did not bear on whether the questions were off-mission. *Id*. at 410 n.4.

In *Green*, we recognized the difficulty in pinpointing the moment when tasks tied to the traffic stop are completed or reasonably should have been completed (what we called the "*Rodriguez* moment"). We also recognized the possibility that the *Rodriguez* moment occurs when an officer no longer

9

pursues the tasks tied to the traffic stop even though he reasonably could have continued with those tasks. 897 F.3d at 182 (citing *Rodriguez*, 575 U.S. at 355) (explaining that an officer waiting for backup due to danger inherent in traffic stops ordinarily does not measurably prolong the traffic stop but complexity is added to the analysis when the officer calls for backup and then does not wait for backup to arrive). Thus, we determined in *Green* that the *Rodriguez* moment occurred no later than when the officer issued the traffic citation, but "instructed Green to wait in his car indefinitely." 897 F.3d at 181. We also determined that the *Rodriguez* moment occurred at the earliest when the officer pursued an off-mission task by making a phone call related to drug trafficking and was "no longer concerned with the moving violation." *Id.* at 182. Even assuming the earlier *Rodriguez* moment in *Green*, we still held the seizure was constitutional because the officer already had reasonable suspicion at that point. *Id*.

So what tasks ordinarily are tied to the mission of a traffic stop? They include: "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 575 U.S. at 355 (internal citation omitted). We have also held that some questions relating to a driver's travel plans ordinarily fall within the scope of the traffic stop, as do delays caused by safety concerns related to the stop. *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003); *Clark*, 902 F.3d at 410.

To lawfully extend a stop beyond when tasks tied to its initial mission are completed or reasonably should have been completed, an officer must have an objectively reasonable and articulable suspicion that illegal activity had occurred or was occurring. *Rodriguez*, 575 U.S. at 355; *Clark*, 902 F.3d at 410.

10

In determining whether the officer had reasonable suspicion, we consider "the totality of the circumstances—the whole picture." *United States v. Cortez*, 449 U.S. 411, 417 (1981). This standard requires "considerably less than proof of wrongdoing by a preponderance of the evidence," *United States v. Sokolow*, 490 U.S. 1, 7 (1989), but requires more than a "hunch." *Terry v. Ohio*, 392 U.S. 1, 27 (1968). Reasonable suspicion depends on both the "information possessed by police and its degree of reliability." *Alabama v. White*, 496 U.S. 325, 330 (1990).

B

The District Court denied the motion to suppress in 2017, before we decided *Green* and *Clark*, so it did not determine when the "*Rodriguez* moment" occurred. Instead, it found that Trooper Ramirez's observations throughout the traffic stop created an "amalgam of information . . . that triggered [his] suspicion that a crime was afoot beyond a moving violation." App. 25.

Our review of the video and audio record leads us to conclude that the earliest the *Rodriguez* moment occurred was when Trooper Ramirez began asking Fruit about his employment, family, criminal history, and other conduct unrelated to the traffic stop. After informing Fruit that he was speeding, Ramirez collected Fruit's driver's license and rental agreement. He noted the rental agreement had expired, but Fruit assured him he had extended the rental term. Before he returned to his cruiser to investigate the status of Fruit's rental agreement, Ramirez questioned Fruit for five minutes about his criminal history. This questioning was not tied to the traffic stop's mission—the speeding violation—because it was "aimed at detecting criminal activity more generally." *Green*,

11

897 F.3d at 179. But if Trooper Ramirez had reasonable suspicion when he began questioning Fruit about his criminal history, even if such questioning at that moment measurably extended the traffic stop, there is no Fourth Amendment violation.

We hold Trooper Ramirez had reasonable suspicion to extend the stop based on information he obtained during the first few minutes of the traffic stop and before he engaged in any unrelated investigation. So no unlawful extension of the traffic stop ever occurred. When Ramirez first spotted the car, he noticed it had a New York license plate and appeared to be a rental car. After learning the vehicle belonged to Enterprise, he noticed it did not have the typical bar code stickers on the driver's window or the rear windshield. These observations aroused his suspicion because, in Ramirez's experience, rental vehicles usually had these stickers unless someone peeled them off in violation of a rental agreement.

As Trooper Ramirez approached the vehicle, he smelled a strong odor of air freshener and saw air fresheners clipped on every vent, which was abnormal in his experience. Ramirez's questions related to the traffic stop revealed that Fruit was traveling along I-81 between New York City and Hagerstown, which Ramirez knew to be a drug trafficking corridor. Ramirez also saw that the rental agreement had expired two weeks earlier and Fruit seemed extremely nervous throughout the stop. In their totality, these factors are sufficient to show that Trooper Ramirez's suspicion of illegal activity was objectively reasonable. So he could extend the traffic stop and Fruit and Garner were not seized in violation of the Fourth Amendment.

12

IV

Fruit also argues that Trooper Ramirez exercised a lack of diligence in his stop, rendering it tantamount to an arrest requiring probable cause. Fruit contends that Ramirez should not have waited for another trooper to arrive before seeking consent or calling for a K-9 unit. Instead, Fruit claims Ramirez should have called the K-9 unit before he asked Fruit for permission to search the vehicle. We are unpersuaded.

Fruit correctly notes that a stop must be "sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion). But Trooper Ramirez had reasonable suspicion to justify further investigation before he even questioned Fruit. And Ramirez explained he called for backup before asking to search the vehicle because it was starting to get dark, Fruit had a previous firearms offense, and he is smaller than Fruit and Garner. He called for backup for officer safety, which is consistent with the mission of any traffic stop. *See Clark*, 902 F.3d at 410. As the Supreme Court has instructed, "[t]raffic stops are 'especially fraught with danger to police officers,' . . . so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely." *Rodriguez*, 575 U.S. at 356 (internal citations omitted).

In the 25 minutes between Trooper Ramirez's return to his vehicle and Trooper Thierwechter's arrival, Ramirez not only ran Fruit and Garner's records—which he said could take 15 minutes or more since the two lived out of state—but also made the phone calls to Enterprise and the Pennsylvania Criminal Intelligence Center. Ramirez called for backup only after running Fruit and Garner's records and making those

13

calls. Thierwechter arrived within ten or fifteen minutes, so this brief delay burdened Fruit only negligibly.

Fruit also argues that Trooper Ramirez should have called for the K-9 unit before asking for consent to search. But this argument fails because we have observed no lack of diligence by officers in waiting to call for K-9 units until after the suspect has denied consent. *See United States v. Frost*, 999 F.2d 737, 742 (3d Cir. 1993). Trooper Ramirez thus acted diligently and needed only reasonable suspicion to conduct the dog sniff, which he had. *See Green*, 897 F.3d at 179–80.

V

In addition to adopting Fruit's unsuccessful arguments, Garner raises two additional issues particular to his appeal. The first involves the admission of evidence and the second relates to his motion for judgment of acquittal. We consider each in turn.

A

At trial, the Government sought to introduce evidence of Garner's 2005 conviction for possession of cocaine, his 2007 conviction for sale of cocaine, and a pending charge from 2016 for possession with intent to distribute marijuana. The District Court admitted Garner's 2007 New York City cocaine trafficking conviction as evidence of knowledge of the cocaine in the car and his intent to distribute it. But it did not admit Garner's drug possession charges from 2005 and 2016, because they were not relevant to this distribution charge.

Garner urges us to overturn our precedent that a conviction makes "the defendant's knowledge of the presence

14

of heroin more probable than it would have been without the evidence as it indicates that he had knowledge of [the drug trade], thus making it less likely that he was in the wrong place at the wrong time." Garner Br. at 20–21 (citing *Givan*, 320 F.3d at 461 (admitting a previous cocaine conviction to prove knowledge and intent to distribute heroin)). This is a nonstarter because only the Court sitting en banc can overturn a prior precedent. *Joyce v. Maersk Line Ltd.*, 876 F.3d 502, 508 (3d Cir. 2017).

Garner also argues the District Court's admission of his 2007 drug trafficking conviction was error under Rules 403 and 404(b) of the Federal Rules of Evidence. We review this decision for abuse of discretion. *United States v. Butch*, 256 F.3d 171, 175 (3d Cir. 2001).

Rule 404(b) provides "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." But that evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." FED. R. EVID. 404(b)(1)–(2).

According to Garner, his 2007 drug trafficking conviction dealt with different facts than those present in this appeal and occurred too long ago to be admissible. He notes that his first conviction involved distributing cocaine on a street corner while this case involves distributing cocaine and heroin in a car. He also argues that a cocaine conviction does not prove that he knew what heroin looks like or how it is sold. He also contends the District Court failed under Federal Rule

15

of Evidence 403 to properly balance the probative value of the evidence against its prejudicial effect.

We apply a four-part test to determine whether prior-acts evidence is admissible under Rule 404(b). *United States v. Davis*, 726 F.3d 434, 441 (3d Cir. 2013); s*ee also Huddleston v. United States*, 485 U.S. 681, 691–92 (1988) (discussing the four sources protecting against undue prejudice of admitting Rule 404(b) evidence). Such evidence is admissible if it is: (1) offered for a non-propensity purpose; (2) relevant to that identified purpose; (3) sufficiently probative under Rule 403 so its probative value is not outweighed by any inherent danger of unfair prejudice; and (4) "accompanied by a limiting instruction, if requested." *Davis*, 726 F.3d at 441.

Garner's 2007 conviction showed that he had personal knowledge about how to identify cocaine, how to traffic it, and how to package, price, and purchase it in New York. If Garner had that knowledge, he could purchase and package drugs in New York, before transporting them to Hagerstown for sale. So his prior conviction showed that Garner had the intent and knowledge to sell packaged cocaine in his possession.

After finding the 2007 cocaine distribution charge relevant, the District Court then balanced its probative value with its prejudicial impact. The Court determined that the conviction's probative value outweighed the danger of unfair prejudice because intent and knowledge are critical to proving a conspiracy. Finally, the Court agreed that it would issue a limiting instruction when requested. As a result, the Court admitted the 2007 conviction into evidence.

The Court admitted the 2007 cocaine trafficking conviction to prove knowledge of cocaine and how to sell it,

16

not to prove intent and knowledge of packaging heroin. Because the Court admitted the evidence only to prove cocaine distribution, the difference between the charges on which Garner was being tried and his prior conviction would be that one took place in a car and the other took place on a street corner. This difference would not affect Garner's knowledge of how to identify, package, and sell cocaine. So Garner's argument about the cases' dissimilarity fails. The District Court correctly applied *Huddleston* and did not abuse its discretion in admitting Garner's cocaine distribution conviction with a limiting instruction.

B

Finally, Garner claims the District Court erred when it denied his Rule 29 motion for judgment of acquittal. He notes that "[t]here was no evidence presented at trial that [he and Fruit] ever had any communications regarding distribution of heroin or cocaine." Garner Br. 30. That's true, but immaterial. Here, the Government relied on circumstantial evidence to prove its case. *See, e.g.*, *United States v. Fullmer*, 584 F.3d 132, 160 (3d Cir. 2009); *United States v. McKee*, 506 F.3d 225, 238 (3d Cir. 2007). Viewing the record, as we must, in the light most favorable to the prosecution, *United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002), ample evidence supported Garner's conspiracy conviction.

That evidence included that: (1) Fruit and Garner were travelling together from New York City (a known drug hub) to Hagerstown (a known drug destination); (2) the rental bar code had been removed from the vehicle; (3) air fresheners were attached to each air vent; and (4) Trooper Ramirez pulled the car over just before 9:00 p.m., with an hour left to reach Greencastle, yet Garner said he planned to travel the next day

17

the four hours back to New York for a court hearing. The Government also elicited testimony that, despite statements by Garner to Trooper Ramirez regarding a court hearing involving child support, there was no record of any such hearing scheduled in the state of New York involving Garner. Evidence at trial also revealed that Garner minimized his criminal history when he told Trooper Ramirez that he had been arrested for fighting while neglecting to mention his extensive history of drug possession and trafficking. A rational trier of fact could find that Garner lied about his drug history because he knew the car contained narcotics. Finally, the two defendants traveled with cocaine and heroin worth over $20,000 in their car and Garner knew about the cocaine trade.

Viewing this evidence as a whole, a rational juror could conclude that Garner agreed with Fruit to possess and distribute the heroin and cocaine in the vehicle. So the District Court did not err in denying the Rule 29 motion.

\*      \*      \*

The District Court did not err when it denied Fruit and Garner's joint motion to suppress the evidence of drug trafficking seized during the traffic stop. Nor did the Court err when it allowed the Government to use Garner's 2007 drug conviction as Rule 404(b) evidence or when it found that the Government adduced sufficient evidence to convict Garner of conspiring with Fruit to distribute heroin and cocaine. We will therefore affirm the judgments of conviction and sentences.