**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 22-2501
_____

UNITED STATES OF AMERICA

v.

RAJERI CURRY,
            Appellant

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 1:19-cr-00677-001)
District Judge: Honorable Robert B. Kugler

_____

Argued: July 30, 2024
_____

Before: KRAUSE, RESTREPO, and MATEY, *Circuit Judges*

(Opinion filed: September 16, 2025)

Gilbert J. Scutti **[ARGUED]**
504 Centennial Boulevard
P.O. Box 1375
Voorhees, NJ 08043
		*Counsel for Appellant*

Mark E. Coyne
Jane M. Dattilo **[ARGUED]**
Office of United States Attorney
970 Broad Street
Room 700
Newark, NJ 07102
		*Counsel for Appellee*

_____

OPINION OF THE COURT
_____

MATEY, *Circuit Judge*.

After Rajeri Curry was arrested for distributing heroin and fentanyl, she requested an attorney. The investigators then asked to examine her cell phone, and Curry consented, providing the phone's passcode. Curry objects to prosecutors using incriminating materials found on her phone, but we cannot exclude evidence to remedy a violation of the prophylactic rule announced in *Edwards v. Arizona*, 451 U.S. 477 (1981). And seeing no other errors, we will affirm the District Court's judgment.

## I.

## A.

This case began with an investigation into drug trafficking by brothers Al-Tariq and Shadee Brown. Curry was Al-Tariq's repeat customer, often buying heroin and fentanyl in bulk based on the "brands" stamped on the packaging. After Al-Tariq died, Shadee stepped in as Curry's contact, a partnership Curry called the "rich gang." Supp. App. 975.

In January 2018, police executed a search warrant at Curry's apartment where they recovered 300 packets of heroin stamped "body count" and "DOA." Supp. App. 287–88. Still, Curry kept buying, purchasing more "body count" from Shadee on May 29, 2018. Three days later, officers responded to a fatal heroin and fentanyl overdose. Surveillance footage showed Curry executing a hand-to-hand transaction with the victim just four hours before he was found dead with four bags of "body count."

Curry was arrested, and police seized the iPhone she had with her. After being read the statement suggested by *Miranda*, Curry told detectives "I want my lawyer." Interview Video 3:40–44.[1] They responded "okay, that's fine," Interview Video 3:44–45, and asked if she would "give us consent for your phone," Interview Video 4:43. Curry declined, prompting a detective to explain that if she refused, they planned to get a warrant and extract the phone's data. A process, he added, that risked erasing the phone's contents. Concerned she would lose

---

[1] The video of Curry's interview is on file with the Clerk's Office.

her files, Curry gave the detectives her passcode and signed a consent form to look through the phone. All agree the detectives did not question Curry about the charged offenses.

**B.**

Curry was indicted for conspiring to distribute heroin and fentanyl, in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(C), and possessing with intent to distribute heroin, in violation of § 841(a)(1) and (b)(1)(C).[2] Prior to trial, the District Court denied Curry's motion to suppress the evidence extracted from her phone, which included text messages with Al-Tariq and Shadee. The United States introduced that evidence at trial, along with Curry's prior drug convictions to prove her knowledge and lack of mistake.

At the close of the prosecution's case, the District Court reserved decision on Curry's motion for a judgment of acquittal on the conspiracy count. After the jury convicted Curry of conspiracy to distribute and possession with intent to distribute, the District Court denied the motion, finding the United States had sustained its burden on every element of a controlled-substance conspiracy.

At sentencing, the District Court calculated a Guidelines range of 210 to 262 months' imprisonment using sentencing guideline 4B1.1's alternate offense level for "career offenders." *See* U.S.S.G. § 4B1.1. Over Curry's objection, the

---

[2] The grand jury also charged Curry with distributing a substance containing heroin and fentanyl, resulting in death, in violation of § 841(a)(1) and (b)(1)(C). But the jury did not reach a verdict on this count.

District Court concluded that guideline 4B1.1 applied because Curry had two prior New Jersey felony convictions for heroin distribution. The District Court sentenced Curry to 216 months' imprisonment.[3]

## II.

Curry says the information found on her phone could not be used against her. To understand why we disagree, a summary of the two sources that could support suppression is

---

[3] The District Court had jurisdiction under 18 U.S.C. § 3231, and we have jurisdiction under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291. On the motion to suppress, we review the District Court's factual findings for clear error and its applications of law de novo. *See United States v. Jackson*, 120 F.4th 1210, 1217 (3d Cir. 2024). Like the District Court, we review the motion for judgment of acquittal "in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." *United States v. Kousis*, 82 F.4th 230, 236 (3d Cir. 2023) (quoting *United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002)). We review the District Court's admission of Rule 404(b) evidence for abuse of discretion. *United States v. Scarfo*, 41 F.4th 136, 178 n.35 (3d Cir. 2022). And we review an interpretation of the Sentencing Guidelines de novo. *United States v. Lewis*, 58 F.4th 764, 767 (3d Cir. 2023).

useful. And both, Constitution and caselaw, confirm no error occurred.

## A.

Begin with the Fifth Amendment, which prevents the United States from compelling a person "in any criminal case to be a witness against himself." U.S. Const. amend. V. This Self-Incrimination Clause "permits a person to refuse to testify against himself at a criminal trial in which he is a defendant," *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984), and "not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings," *id.* (quoting *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973)). But "[t]he Fifth Amendment, of course, is not concerned with nontestimonial evidence," *Oregon v. Elstad*, 470 U.S. 298, 304 (1985), so it only applies to "evidence of a testimonial or communicative nature," *Schmerber v. California*, 384 U.S. 757, 761 (1966). And "in order to be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information." *Doe v. United States*, 487 U.S. 201, 210 (1988). If a person is compelled to provide testimonial evidence in one of these settings, the evidence ordinarily cannot be admitted at trial.[4] *Elstad*, 470 U.S. at 305–06.

---

[4] There is a separate line of cases addressing the admissibility of involuntary statements under the Due Process Clauses of the Fifth and Fourteenth Amendments. *See Dickerson v. United States*, 530 U.S. 428, 433 (2000) ("[F]or the middle third of the 20th century our cases based the rule against admitting coerced confessions primarily, if not

Curry does not argue that her interactions with the detectives "compelled" her to speak. That is understandable, as the bar for compulsion under the Fifth Amendment is high,[5] requiring a defendant to show that his "will was overborne in such way as to render his confession the product of coercion," *Arizona v. Fulminate*, 499 U.S. 279, 288 (1991), based on "the totality of all the surrounding circumstances," *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). But that is not the end of her claim, because *Miranda v. Arizona*, 384 U.S. 436 (1966) grafted onto the Self-Incrimination Clause "a set of prophylactic measures to protect a suspect's Fifth Amendment right from the 'inherently compelling pressures' of custodial interrogation." *Maryland v. Shatzer*, 559 U.S. 98, 103 (2010) (quoting *Miranda*, 384 U.S. at 467). As a result, law enforcement must explain that a suspect can choose to remain silent, or consult an attorney, before agreeing to a custodial interrogation. *Miranda*, 384 U.S. at 444.[6]

---

exclusively, on notions of due process."). But they are rarely seen, with courts ordinarily reaching for the more familiar *Miranda* framework. *See Elstad*, 470 U.S. at 304–05; *Dickerson*, 530 U.S. at 434.

[5] To be clear, that bar is only high absent legal process, such as a subpoena. *Schmerber*, 384 U.S. at 763–64.

[6] Because *Miranda* applies even when a person is not compelled to speak, *see Michigan v. Tucker*, 417 U.S. 433, 444 (1974), a *Miranda* violation does not alone offend the Due Process or Self-Incrimination Clauses, *see Vega v. Tekoh*, 597 U.S. 134, 142–50 (2022).

**B.**

Turn next to caselaw, which creates an important distinction between "direct" and "derivative" evidence. Curry is not much concerned about her conversation with the detectives regarding her phone and its passcode. Rather, she seeks to suppress "evidence derived directly and indirectly therefrom," *Kastigar v. United States*, 406 U.S. 441, 453 (1972), like the incriminating text messages she shared with Al-Tariq and Shadee. A brief explanation of the standards applicable to different kinds of evidence is necessary.

**1.**

Sometimes a defendant seeks to suppress evidence that has a direct relationship to the alleged unlawful governmental conduct.[7] For example, suppose an investigating officer discovers a suspect wearing an empty shoulder holster and asks "where the gun was," prompting the suspect to "nod[] in the direction of some empty cartons and respond[], 'the gun is over there.'"[8] The defendant's response then results from the alleged improper interrogation, and *Miranda*'s prophylactic exclusionary rule applies. *See United States v. DeSumma*, 272 F.3d 176, 180 (3d Cir. 2001).[9]

Compare these direct statements to something derivative, what Justice Frankfurter called the "fruit of the

---

[7] *See* 3 Wayne R. LaFave et al., Criminal Procedure § 9.3, at 476 (4th ed. 2015).

[8] *New York v. Quarles*, 467 U.S. 649, 652 (1984).

[9] Unless some exception applies. *See, e.g.*, *Quarles*, 467 U.S. at 655.

poisonous tree."[10] As when, continuing our example, the prosecution seeks to offer into evidence the gun found among the empty cartons. Whether to exclude that derivative evidence turns on a further question: does the defendant state a constitutional violation or the neglect of a prophylactic rule?

Actual constitutional violations are handled under a single standard: they render both direct and derivative evidence inadmissible. *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).[11] The same is true for direct evidence collected afoul of *Miranda*. *DeSumma*, 272 F.3d at 180. But "derivative evidence secured as a result of a voluntary statement obtained before *Miranda* warnings are issued" is not excludable. *Id.* That is because *Miranda* sweeps much further than our constitutional protections, reaching statements lacking the compulsion necessary under the Fifth Amendment. *Elstad*, 470 U.S. at 306–07. So voluntary, but unwarned, statements may be admitted for limited purposes, like impeachment, *Harris v. New York*, 401 U.S. 222, 224–26 (1971), whereas use of an involuntary statement is prohibited by the Fifth Amendment, *Mincey v. Arizona*, 437 U.S. 385, 398 (1978). And evidence discovered because of a voluntary unwarned statement is not suppressed as it would be for an involuntary statement. *Elstad*, 470 U.S. at 305–07.

---

[10] *Nardone v. United States*, 308 U.S. 338, 341 (1939).

[11] *See also Nix v. Williams*, 467 U.S. 431, 441–42 (1984) (extending *Wong Sun*'s exclusionary rule to a Sixth Amendment violation); *Chavez v. Martinez*, 538 U.S. 760, 769 (2003) (plurality opinion) ("[T]hose subjected to coercive police interrogations have an *automatic* protection from the use of their involuntary statements []or evidence derived from their statements . . . .").

**2.**

One final piece of the puzzle arrives in "a second layer of prophylaxis." *McNeil v. Wisconsin*, 501 U.S. 171, 176 (1991). Under *Edwards*, when a suspect asks for counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. at 484–85. If police interrogate a suspect who asked to speak with an attorney, courts treat direct evidence of that conversation as if no *Miranda* warning was given, even if the suspect otherwise validly waived his rights. *Arizona v. Roberson*, 486 U.S. 675, 681–82 (1988). *Edwards* acts as a "reinforce[ment]" of *Miranda*'s prophylactic protections, *Minnick v. Mississippi*, 498 U.S. 146, 147 (1990), "designed" to reiterate the prescribed procedures, *Michigan v. Harvey,* 494 U.S. 344, 350 (1990). But, like *Miranda*, *Edwards* "is not a constitutional mandate, but judicially prescribed prophylaxis." *Shatzer*, 559 U.S. at 105.[12] That is because, as with *Miranda*, to substantiate an *Edwards* violation, a defendant need not show that a statement was "compelled" under the Fifth Amendment. So a statement can be constitutionally voluntary, yet inadmissible because of *Edwards*.

---

[12] The dissent implies that a violation of *Edwards* necessarily amounts to a violation of the Fifth Amendment. But that argument is foreclosed by *Shatzer* and the reasoning of numerous other decisions we outline.

## C.

Applying this framework, Curry cannot suppress the evidence found on her phone. That evidence is not derivative of a constitutional violation because Curry voluntarily provided the detectives with her passcode, and the "Fifth Amendment prohibits use by the prosecution in its case in chief only of *compelled* testimony." *Elstad*, 470 U.S. at 306–07. With no constitutional concerns, *Wong Sun*'s automatic exclusion of derivative evidence does not apply.

Recognizing this limit, Curry asks for a new rule that would also exclude derivative evidence for *Edwards* violations. But the Supreme Court has created such a rule "only where its benefits outweigh its costs." *Vega v. Tekoh*, 597 U.S. 134, 151 (2022) (quoting *Shatzer*, 559 U.S. at 106). That analysis carries "a strong presumption against expanding" *Miranda*'s prophylactic rules. *United States v. Patane*, 542 U.S. 630, 640 (2004) (plurality opinion). One this Court and the Supreme Court have repeatedly recognized by rejecting requests to suppress derivative evidence for *Miranda* violations. *Elstad*, 470 U.S. at 314; *Tucker*, 417 U.S. at 452; *DeSumma*, 272 F.3d at 180. And as "a second layer of prophylaxis," *Edwards* stands even further from the constitutional right that could justify *Wong Sun* exclusion. *McNeil*, 501 U.S. at 176. Nor would Curry's proposed practice offer much help, as officers would simply have asked for her cell-phone passcode before they mentioned *Miranda*, confident the contents would not be suppressed as the fruits of

11

an unwarned statement. *See DeSumma*, 272 F.3d at 180. So the District Court did not err.[13]

### III.

Curry raises several other issues, none showing error. First, she argues the District Court improperly denied her motion for judgment of acquittal on the conspiracy count. "[O]n the defendant's motion," a district court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). To prove Curry was a member of the conspiracy, the United States had to establish "a shared unity of purpose between the alleged conspirators," "an intent to achieve a common goal," and "an agreement to work together toward that goal." *United States v. Bailey*, 840 F.3d 99, 108 (3d Cir. 2016). Evidence that supports these elements includes the duration and nature of the coconspirators' relationship, quantity of drugs involved, established payment methods, and standardized transactions. *See id.*

Curry claims the prosecution's presentation fell short and showed no more than "a simple buyer-seller relationship." *United States v. Gibbs*, 190 F.3d 188, 197 (3d Cir. 1999). But "[v]iewing the record, as we must, in the light most favorable to the prosecution, ample evidence supported" Curry's conviction. *United States v. Garner*, 961 F.3d 264, 274 (3d Cir. 2020) (citation omitted). Curry began texting with Al-Tariq on March 16, 2018, and after his death that month, she started

---

[13] For this reason, we need not address the District Court's alternative bases for denying the motion to suppress. *United States v. Agnew*, 407 F.3d 193, 196 (3d Cir. 2005).

texting Shadee. Scattered across these messages are displays of trust, like Curry thanking Shadee "for treating me the same way as bro did and that [batch] rocking keep it the recipe" and Shadee responding "Ok no problem u are family." Supp. App. 974. And the text messages alone reflect the purchase of 179 bricks of heroin over the three-month period. This is sufficient evidence of a conspiracy. That conclusion is unaltered by the limited references to payment, or the absence of standardized transactions. The United States was only tasked with proving the elements set down by Congress, not doing so in every conceivable way. *United States v. Iglesias*, 535 F.3d 150, 156 (3d Cir. 2008). Curry's text messages further the inference that she "was part of a larger operation and hence can be held responsible as a coconspirator." *Id.* (quoting *Gibbs*, 190 F.3d at 200). A reasonable juror could conclude that Curry, Al-Tariq, and Shadee "shared a common goal" to distribute large quantities of heroin and fentanyl with "the intent to achieve that goal, and a tacit agreement to cooperate to achieve it." *Id.* Section 846 requires no more.

**IV.**

Nor did the District Court abuse its discretion in admitting evidence of Curry's prior conviction for heroin distribution under Federal Rule of Evidence 404(b). We consider whether the contested evidence has "a nonpropensity purpose and satisf[ies] the same relevancy requirements as any other evidence." *United States v. Davis*, 726 F.3d 434, 441 (3d Cir. 2013). "There is no question that, given a proper purpose and reasoning, drug convictions are admissible in a trial where the defendant is charged with a drug offense." *United States v. Sampson*, 980 F.2d 883, 887 (3d Cir. 1992). Such is the case here. Curry's close-in-time heroin distribution is relevant to her

knowledge and the absence of mistaken involvement with large quantities of heroin. *See Davis*, 726 F.3d at 443. The District Court correctly balanced the probative value of this evidence with its prejudicial impact. And any potential prejudice was minimized by a limiting instruction that the District Court issued after the evidence's admission and at the close of trial, because "we presume that the jury followed the limiting instruction . . . and considered evidence . . . only for the limited purposes offered." *United States v. Cruz*, 326 F.3d 392, 397 (3d Cir. 2003). So the District Court did not abuse its discretion.

## V.

Curry's challenge to the application of the career-offender enhancement also lacks merit. A defendant qualifies as a career offender if she "has at least two prior felony convictions of . . . a controlled substance offense."[14] § 4B1.1(a). In 2007 and 2010, Curry was convicted of distributing heroin in New Jersey. She claims "the New Jersey statutes for the offenses were broader than the federal definition of a controlled substances offense." Opening Br. 34. But "the meaning of 'controlled substance' . . . is a drug regulated by either state or federal law." *United States v. Lewis*, 58 F.4th 764, 770–71 (3d Cir. 2023). So "[i]t is therefore irrelevant that the New Jersey statute under which [Curry] was convicted defined [heroin] more broadly than federal law." *Id.*

---

[14] Curry does not contest that the other elements of the enhancement apply to her, namely that she was at least eighteen years old at the time of the instant offense, and the instant offense is "a controlled substance offense." § 4B1.1(a).

at 771. Curry's challenge to the application of the career-offender enhancement therefore fails.

\* \* \*

For these reasons, we will affirm the District Court's judgment.

Restrepo, *Circuit Judge*

Because I disagree with my colleagues that evidence obtained in violation of a suspect's Fifth Amendment right to counsel should be deemed admissible, I respectfully dissent. The majority's opinion decides an issue previously unresolved in this Circuit.[1] While "the fruit of the poisonous tree" doctrine does not generally apply to evidence derived from a suspect's voluntary statements elicited without *Miranda* warnings, the majority's decision extends that principle to evidence derived from statements elicited after a suspect unequivocally invokes her Fifth Amendment right to counsel. But such an extension is contrary to the law. While failing to issue *Miranda* warnings may not result in harm to a suspect's rights, violating a suspect's invoked right to counsel inflicts the very harm the warnings seek to prevent. Here, the detectives continued to interrogate Curry and elicited the passcode to her cell phone without allowing her contact with an attorney. *Edwards v. Arizona*, 451 U.S. 477, 485 (1981). The "fruit" of this illegally obtained testimonial statement was the evidence of drug-dealing found on her phone. As the *Edwards* court recognized, and as *Wong Sun* dictates, that evidence resulting from police exploiting their illegal conduct must be suppressed. *Edwards*, 451 U.S. at 485; *Wong Sun v. United States*, 371 U.S. 471, 488 (1963). For this reason, I dissent from Part II of the majority's opinion.

---

[1] *See United States v. Caesar*, 2 F.4th 160, 168 n.4 (3d Cir. 2021) (noting that this Court has "not opined whether the same principle applies to physical evidence derived from a suspect's statements elicited in violation of *Edwards*").

1

The video of Curry's custodial interrogation shows one of the two Atlantic City Detectives issued the *Miranda* warnings and that Curry immediately stated she wanted her attorney present. The detectives asked again, and Curry reiterated her request for a lawyer. Immediately thereafter, without acknowledging the invocation of her right, a detective asked if she wanted to give consent to search her phone. Curry said no. Interview Video 6:52:12.[2] One of the detectives told Curry that they would "type up a search warrant for her phone" and then "hook [the phone] up to our computers and go through it that way." Curry asked again to confirm that they wanted to search her phone, to which a detective answered that they would "do it anyway" and that "sometimes [the police machines] wipe the data clean." 6:52:50. After she confirmed that her photos and "stuff like that" would be deleted, Curry agreed to the search. When she stated that she did not want to give her passcode, one detective informed her that it was "after hours so the guys that [search the phones]" were not present and they therefore needed the passcode "to open it up." 6:53:40. Curry wrote down her passcode and then partially verbalized it when the detectives asked her to clarify her writing. 6:54:50. The detectives then left the interrogation room with the phone. There was no break in the questioning and Curry never spoke to her attorney during the interrogation.

Inherent in the majority's opinion is that Curry was subject to custodial interrogation when she provided her passcode and that the passcode itself constituted a testimonial statement entitled to Fifth Amendment protection. I agree with both conclusions. By

---

[2] The video of Curry's interview is on file with the Clerk's Office.

suggesting that they would otherwise delete the contents of the phone, the detectives asked for the passcode in a manner they knew was "reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). Passcodes constitute testimony because they reveal the subjective knowledge and thought processes of a suspect. By giving up her passcode, Curry explicitly "relate[d] a factual assertion or disclose[d] information" to the detectives. *Doe v. United States*, 487 U.S. 201, 210 (1988).

I also agree with the majority's conclusion that the bright-line rule enunciated in the Supreme Court's *Edwards* opinion was violated. *Edwards* commands that when a suspect unambiguously invokes her right to counsel, all police-led interrogations must cease. 451 U.S. at 484–85. Once the right is invoked, any "incriminating statements made without [the suspect's] attorney present violate[s] the rights secured to [her] by the Fifth and Fourteenth Amendments to the United States Constitution." *Oregon v. Bradshaw*, 462 U.S. 1039, 1043 (1983). *See also Shea v. Louisiana,* 470 U.S. 51, 52 (1985) ("[T]his Court [in *Edwards*] ruled that a criminal defendant's rights under the Fifth and Fourteenth Amendments were violated by the use of his confession obtained by police-instigated interrogation—without counsel present—after he requested an attorney"). Here, the detectives immediately continued their interrogation after Curry unequivocally requested counsel—without counsel present. When she hesitated to share her passcode, the detectives persevered until she capitulated.

Much is made of the prophylactic nature of *Miranda* and its progeny in order to distinguish procedural *Miranda* violations from actual Fifth Amendment violations, where

3

police extract statements from suspects through coercion. I agree that evidence derived from statements following procedural *Miranda* violations, such as those arising from the "simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will," need not be suppressed. *Oregon v. Elstad*, 470 U.S. 298, 309 (1985). As the majority notes, the Supreme Court has described *Edwards*'s mandate of informing a suspect of her right to counsel as "a second layer of prophylaxis." Majority Op., 9; *McNeil v. Wisconsin*, 501 U.S. 171, 176 (1991). While the first layer of safeguards provides warnings to protect a suspect from self-incrimination, the "second layer" provides a suspect with the right to counsel to prevent such self-incrimination from taking place. The majority's position, therefore, seems to be that an officer disregarding a suspect's invocation of counsel merely violates a procedural safeguard without undermining her ability to exercise her free will or violating a constitutionally secured right.

But that is neither a fair nor accurate assessment, and not one the Supreme Court has endorsed. While warning a suspect of the right to counsel is prophylactic, her invocation of that right is entitled to protection under the Fifth Amendment. If a suspect's testimonial statement is improperly elicited without warnings, "*Miranda*'s preventive medicine provides a remedy even to the defendant who has suffered no identifiable constitutional harm." *Elstad*, 470 U.S. at 307. In other words, *Miranda* mandates the suppression of the statement even if no Fifth Amendment violation has taken place. This is not that situation. Here, Curry's Fifth Amendment right to counsel attached when she

4

unequivocally requested to have her attorney present. That right was then violated when her interrogation continued without counsel, and she suffered identifiable constitutional harm because her consequent statement was presumed to be the result of coercion. *See Smith v. Illinois,* 469 U.S. 91, 98–99, 99 n.8 (1984) (holding that statements made after an unambiguous request for counsel are presumed to be the product of coercion and therefore cannot cast doubt on the suspect's invocation of the right).

The Supreme Court, recognizing the difference between procedural safeguards and a suspect's Fifth Amendment rights, described failure to warn cases as "inapposite" to cases like Curry's, where the right "to have counsel present [was] flatly ignored while police subjected them to continued interrogation." *Elstad*, 470 U.S. at 312 n.3. *Edwards* imposed a "'rigid rule'" that interrogations must cease because "'an accused's request for an attorney is *per se* an invocation of his Fifth Amendment rights.'" 451 U.S. at 485 (quoting *Fare v. Michael C.*, 442 U.S. 707, 719 (1979)). That invocation triggered her "'undisputed right'" to not be interrogated until the suspect "'had consulted with a lawyer.'" *Id.* (quoting *Innis*, 446 U.S. at 298); *see also McNeil v. Wisconsin*, 501 U.S. 171, 176-178 (1991) (describing the *Miranda-Edwards* Fifth Amendment right to have counsel present during custodial interrogation); *Flamer v. Delaware*, 68 F.3d 710, 726 (3d Cir. 1995) (recognizing the Fifth Amendment right to counsel during custodial interrogation is not offense-specific). Rather than merely fail to follow procedure, therefore, the detectives ignored Curry's *per se* invocation of her Fifth Amendment right to have counsel present.

Tellingly, *Edwards* does not distinguish between a violation of a suspect's right to counsel and a Fifth Amendment violation, indicating that the Court viewed them as one and the same. The *Edwards* rule protects the Fifth Amendment rights of those "'not capable of undergoing [custodial] questioning without the advice of counsel.'" *Maryland v. Shatzer*, 559 U.S. 98, 104 (2010) (quoting *Arizona v. Roberson*, 486 U.S. 675, 681 (1988)) (alteration in original). Here, Curry suffered the precise constitutional harm the Fifth Amendment right to counsel seeks to prevent—giving an incriminating response while subject to a custodial interrogation. Had the law been followed and Curry's counsel had been present for her interrogation, she would have been advised not to share the passcode with the detectives. Contrary to my colleagues' conclusion, the detectives did not need to employ physical coercion to violate her Fifth Amendment right to counsel. Instead, Curry's right to counsel had already attached, and the passcode was elicited in circumstances where it is presumed that her statement was coerced and not "'the product of [her] free choice.'" *Shatzer*, 559 U.S. 103 (quoting *Miranda v. Arizona*, 384 U.S. at 436, 458 (1966)). *See also United States v. Pantane*, 542 U.S. 630, 639 (2004) (explaining that unwarned custodial interrogations carry a "presumption of coercion").

The detectives' violation of Curry's Fifth Amendment right to counsel should have resulted in suppression of the evidence derived from her passcode. In determining whether the "fruit" doctrine applies to the contents of Curry's phone, the pertinent inquiry is "whether, granting the establishment of the primary illegality, the evidence . . . has been come at by exploitation of that illegality or instead by means sufficiently distinguishable

6

to be purged of the primary taint." *Wong Sun*, 371 U.S. at 488; *see also Nix v. Williams*, 467 U.S. 431, 441-42 (1984) (holding the exclusionary rule requires suppression of evidence tainted by a violation of the Fifth Amendment). The primary illegality was the detectives flatly ignoring Curry's invocation of her right to counsel and continuing their interrogation. That illegality was exploited to get Curry to provide her passcode. Given that nothing purged the primary taint of illegality of the interrogation following her invocation of the right to counsel, the "fruit" doctrine requires the suppression of evidence derived from the detectives exploiting the absence of her attorney. This is what the *Edwards* court intended when it concluded that the "fruits of the interrogation" that followed Edwards's invoking his right to counsel "could not be used against [him]," signifying that *Wong Sun* applies to violations of a suspect's Fifth Amendment right to counsel. *Edwards*, 451 U.S. at 485.

The majority asserts that suppressing the contents of Curry's phone would be a "bold and controversial claim of authority" because such an action would not deter police misconduct. Maj. Op. at 10 (citing *Vega v. Tekoh*, 597 U.S. 134, 149 (2020)). According to my colleagues, if we were to suppress the "fruits" resulting from intentional violations of a suspect's Fifth Amendment right to counsel, then police would solicit testimony, such as passcodes, before issuing *Miranda* warnings. Under the majority's reasoning, suppressing the contents of Curry's phone would cause police officers to intentionally violate *Miranda* procedures and illegally elicit testimony from suspects to gain access to evidence. Putting aside this discouraging assumption, the majority is choosing to condone

7

violating a suspect's right to counsel in order to deter police from deliberately omitting *Miranda* warnings. I posit that encouraging the infliction of actual constitutional harm is not the proper way to protect procedural safeguards. Instead, this Court should protect a suspect's right to counsel, as secured and protected by the Constitution.

Suppressing evidence that arises from exploited illegal conduct is hardly "bold and controversial." Majority Op. at 10 (citing *Vega*, 597 U.S. at 149). Indeed, it is far bolder to disregard the constitutional right and bright-line rule established in *Edwards*, and to eviscerate the holding of *Wong Sun*. It is especially bold in this instance, given that the testimonial statement of a numerical passcode is unlikely to be incriminating whereas the contents of a suspect's phone will almost certainly contain evidence of wrongdoing, if such evidence exists. The Supreme Court has recognized that cell phones "typically expose . . . far *more* than the most exhaustive search of a house" because they contain no less than "[t]he sum of an individual's private life." *Riley v. California*, 573 U.S. 373, 394–95 (2014) (emphasis in original). Failing to protect evidence illegally obtained in violation of a suspect's constitutional rights, where the suppression of the testimonial statement acts as a meaningless deterrent, only invites more of the flagrant misconduct seen here. I am therefore compelled to dissent.